**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

REPRESENTATIVE RONNY JACKSON,

Plaintiff,

v.

SHIRLEY N. WEBER, in her official
capacity as California Secretary of State and
GAVIN NEWSOM, in his official capacity as
Governor of California,

Defendants.

Case 2:25-cv-00197-Z

Hon. Matthew J. Kacsmaryk

**DEFENDANTS' COMBINED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFF'S COMPLAINT AND OPPOSITION TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    I.   Texas Approves Mid-Decade Redistricting ......................................................... 2

    II.  California and Other States Consider Mid-Decade Redistricting ....................................... 3

    III. Challenges to California's Redistricting Efforts ................................................... 5

        A.     The California Supreme Court Already Denied Two Challenges by State
        Legislators ......................................................................................................... 5

        B.     Plaintiff Challenges California's Proposed Constitutional Amendment in Texas ....... 6

LEGAL STANDARDS ........................................................................................................ 7

ARGUMENT ..................................................................................................................... 8

    I.   The Court Must Dismiss the Complaint for Lack of Personal Jurisdiction ........................ 8

        A.     Plaintiff Fails to Establish Minimum Contacts Between Defendants and Texas ....... 10

        B.     "Effects Jurisdiction" Does Not Apply ........................................................ 12

    II.  Dismissal Is Warranted Because Texas Federal Court Is Not a Proper Venue .................. 13

    III. This Court Lacks Subject Matter Jurisdiction ................................................... 14

        A.     Plaintiff Pleads No Justiciable Cause of Action .......................................... 14

            1.   Plaintiff's Guarantee Clause Claim, Like All Such Claims, Is Categorically
            Nonjusticiable ...................................................................................... 14

            2.   Private Litigants Cannot Derive a Cause of Action Directly from the Elections
            Clause .................................................................................................. 15

        B.     Plaintiff Cannot Establish the Requisite Article III Standing or Ripeness ............... 18

            1.   Plaintiff Cannot Establish Any Cognizable Injury-in-Fact ........................... 19

            2.   Plaintiff Cannot Establish That Any Alleged Injury Would Be Fairly Traceable to
            ACA 8, Prop 50, or Defendants' Actions ................................................ 23

            3.   Plaintiff Cannot Establish Redressability ............................................... 24

            4.   Plaintiff's Claims Are Not Ripe ............................................................. 25

        C.     Plaintiff's Claims are Barred By the Eleventh Amendment ............................... 26

    IV. Plaintiff Fails to State a Claim on the Merits ................................................... 28

        A.     Federal Law Does Not Bar States from Modifying Their Redistricting Processes.... 29

        B.     The Legislature Did Not Violate the State Constitution in Passing ACA 8 .............. 30

    V.  Plaintiff Fails to Satisfy the Remaining Preliminary Injunction Factors ......................... 32

A.    Plaintiff Cannot Establish Irreparable Harm ................................................................ 33

B.    The Public Interest and Balance of the Equities Tip Sharply in Favor of Denying Interim Relief................................................................................................................ 34

CONCLUSION........................................................................................................................ 35

## TABLE OF AUTHORITIES

**CASES**

*Abdullah v. Paxton*
    65 F.4th 204 (5th Cir. 2023) ................................................................................19, 33

*Alden v. Maine*
    527 U.S. 706 (1999)....................................................................................................34

*Allred v. Moore & Peterson*
    117 F.3d 278 (5th Cir. 1997) ...............................................................................13, 18

*Anderson v. Jackson*
    556 F.3d 351 (5th Cir. 2009) .......................................................................................8

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*
    576 U.S. 787 (2015)..............................................................................................21, 29

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)................................................................................................7, 32

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*
    571 U.S. 49 (2013)........................................................................................................8

*Baker v. Carr*
    369 U.S. 186 (1962)..............................................................................................14, 15

*Bennett v. Spear*
    520 U.S. 154 (1997)....................................................................................................25

*Bigham v. Envirocare of Utah, Inc.*
    123 F. Supp. 2d 1046 (S.D. Tex. 2000) ......................................................................8

*Bognet v. Sec'y Commonwealth of Pa.*
    980 F.3d 336 (3d Cir. 2020)...................................................................................20, 21

*Bruni v. Hughs*
    468 F. Supp. 3d 817 (S.D. Tex. 2020) ......................................................................20

*Bulkley & Assocs., LLC v. Dep't of Indus. Rels., Div. of Occupational Safety &*
    *Health of the State of Cal.*
    1 F.4th 346 (5th Cir. 2021) ...............................................................................9, 11, 12

*Burger King Corp. v. Rudzewicz*
    471 U.S. 462 (1985).....................................................................................................9

*Busch v. Viacom Int'l, Inc.*
    477 F. Supp. 2d 764 (N.D. Tex. 2007) .....................................................................11

*Calder v. Jones*
465 U.S. 783 (1984)..................................................................................................10, 12, 13

*Carney v. Adams*
592 U.S. 53 (2020)...................................................................................................................24

*Catlett v. Duncanville Indep. Sch. Dist.*
No. 3:09-CV-1245-K, 2010 WL 2217889 (N.D. Tex. May 27, 2010)...................................26

*City of Austin v. Paxton*
943 F.3d 993 (5th Cir. 2019) .................................................................................................26

*City of Los Angeles v. Lyons*
461 U.S. 95 (1983)..............................................................................................................19, 33

*El Bey v. Dominguez*
540 F. Supp. 3d 653 (N.D. Tex. 2020) ..............................................................................26, 27

*Farmer Boys' Catfish Kitchens Int'l, Inc. v. Golden W. Wholesale Meats, Inc.*
18 F. Supp. 2d 656 (E.D. Tex. 1998).....................................................................................11

*Food & Drug Admin. v. All. for Hippocratic Med.*
602 U.S. 367 (2024)............................................................................................... *passim*

*Foster v. Love*
522 U.S. 67 (1997)...................................................................................................................16

*Freedom Coal. of Drs. for Choice v. Centers for Disease Control & Prevention*
No. 2:23-cv-102-Z, 2023 WL 910543 (N.D. Tex. Nov. 3, 2023) .........................................14

*Gill v. Whitford*
585 U.S. 48 ..............................................................................................................................23

*Goldlawr, Inc. v. Heiman*
367 U.S. 463 (1962).................................................................................................................14

*Google, Inc. v. Hood*
822 F.3d 212 (5th Cir. 2016) .................................................................................................33

*Growe v. Emison*
507 U.S. 25 (1993)......................................................................................................................2

*Johnson v. TheHuffingtonPost.com, Inc.*
21 F.4th 314 (5th Cir. 2021) ..................................................................................................13

*Jordan v. Fisher*
823 F.3d 805 (5th Cir. 2016) ....................................................................................................8

*King v. Whitmer*
    505 F. Supp. 3d 720 (E.D. Mich. 2020)................................................................16, 17, 21

*Lance v. Coffman*
    549 U.S. 437 (2007)..........................................................................................15, 16, 20

*League of Women Voters of Utah v. Utah State Legislature*
    __ P. 3d __, 2025 WL 2662164 (Utah 2025).......................................................................3

*Legislature v. Deukmejian*
    34 Cal. 3d 658 (1983) ...........................................................................................................30

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 ............................................................................................................23, 24

*McCulloch v. Maryland*
    4 Wheat. 316 (1819) .........................................................................................................30

*Mi Familia Vota v. Abbott*
    977 F.3d 461 (5th Cir. 2020) .........................................................................................28, 34

*Minnesota v. Nat'l Tea Co.*
    309 U.S. 551 (1940).............................................................................................................18

*Mississippi State Democratic Party v. Barbour*
    529 F.3d 538 (5th Cir. 2008) ...........................................................................................26

*Moore v. Harper*
    600 U.S. 1 (2023)..............................................................................................14, 18, 28

*Morris v. Livingston*
    739 F.3d. 740 (5th Cir. 2014) ..........................................................................................28

*Munaf v. Geren*
    553 U.S. 674 (2008).............................................................................................................8

*Okpalobi v. Foster*
    244 F.3d 405 (5th Cir. 2001) ...........................................................................................28

*Paz v. Brush Engineered Materials, Inc.*
    445 F.3d 809 (5th Cir. 2006) .............................................................................................7

*Pennhurst State Sch. & Hosp. v. Halderman*
    465 U.S. 89 (1984)..........................................................................................................26, 27

*Planned Parenthood Gulf Coast, Inc. v. Phillips*
    24 F.4th 442 (5th Cir. 2022) ...........................................................................................27

*Powell v. McCormack*
    395 U.S. 486 (1969)..................................................................................................22

*Raines v. Byrd*
    521 U.S. 811 (1997)...............................................................................................21, 22

*Rucho v. Common Cause*
    588 U.S. 684 (2019)............................................................................................. *passim*

*Rumble, Inc. v. World Fed'n of Advertisers*
    No. 7:24-CV-0115-B, 2025 WL 2345076 (N.D. Tex. Aug. 13, 2025).............................10, 12

*Sanchez v. Weber*
    No. S292592, 2025 Cal. LEXIS 5694 (Cal. Aug. 27, 2025) .................................................2, 6

*Sangha v. Navig8 ShipManagement Priv. Ltd.*
    882 F.3d 96 (5th Cir. 2018) .........................................................................................9

*Sharma v. Hirsch*
    121 F.4th 1033 (4th Cir. 2024) .................................................................................16, 18

*Smiley v. Holm*
    285 U.S. 355 (1932)..................................................................................................29

*Southwest Voter Registration Educ. Project v. Shelley*
    344 F.3d 914 (9th Cir. 2003) ......................................................................................35

*State of Ohio ex rel. Davis v. Hildebrant*
    241 U.S. 565 (1916)..................................................................................................29

*Strickland v. Weber*
    No. S292490, 2025 Cal. LEXIS 5421 (Cal. Aug. 20, 2025) .................................................2, 6

*Stroman Realty, Inc. v. Wercinski*
    513 F.3d 476 (5th Cir. 2008) .....................................................................................9, 13

*Texas Alliance for Retired Americans v. Hughs*
    976 F.3d 564 (5th Cir. 2020) ......................................................................................35

*Texas v. Pennsylvania*
    141 S. Ct. 1230 (2020)...............................................................................................21

*Texas v. United States*
    809 F.3d 134 (5th Cir. 2015) ......................................................................................35

*Texas Voters Alliance v. Dallas Cnty.*
    495 F. Supp. 3d 441 (E.D. Tex. 2020)........................................................................ *passim*

*Trinity Indus., Inc. v. Martin*
   963 F.2d 795 (5th Cir. 1992) ....................................................................................20

*Trump v. New York*
   592 U.S. 125 (2020)....................................................................................19, 20, 26

*United States ex rel Johnson v. Raytheon Co.*
   93 F.4th 776 (5th Cir. 2024) .......................................................................................7

*Veasey v. Abbott*
   870 F.3d 387 (5th Cir. 2017) ....................................................................................34

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*
   535 U.S. 635 (2002)....................................................................................................27

*Villarreal v. Wells Fargo Bank, N.A.*
   814 F.3d 763 (5th Cir. 2016) .......................................................................................7

*Virginia Off. for Prot. & Advoc. v. Stewart*
   563 U.S. 247 (2011)....................................................................................................26

*Walden v. Fiore*
   571 U.S. 277 (2014)....................................................................................9, 11, 12, 13

*Walker v. Beaumont Indep. Sch. Dist.*
   938 F.3d 724 (5th Cir. 2019) .......................................................................................7

*WeInfuse LLC v. Endue Inc.*
   No. 3:23-CV-02595-E, 2024 WL 3528646 (N.D. Tex. July 24, 2024) ...................11

*Whole Woman's Health v. Jackson*
   595 U.S. 30 (2021)......................................................................................................28

*Will v. Michigan Dep't of State Police*
   491 U.S. 58 (1989)......................................................................................................26

*Williams v. Wynne*
   533 F.3d 360 (5th Cir. 2008) .......................................................................................7

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008)............................................................................................8, 33, 34

*Wyatt v. Kaplan*
   686 F.2d 276 (5th Cir. 1982) .......................................................................................7

*Ex parte Young*
   209 U.S. 123 (1908)......................................................................................26, 27, 28

**STATUTES**

28 U.S.C. § 1391................................................................................................................13

28 U.S.C. § 1391(b).............................................................................................................7

28 U.S.C. § 1404(a) ...........................................................................................................14

28 U.S.C. § 1406(a) ..................................................................................................8, 13, 14

42 U.S.C. § 1983................................................................................................................15

42 U.S.C. § 1988................................................................................................................15

Assem. Bill 604, 2025 Cal. Stat., ch. 96 .......................................................................4, 31

Assem. Const. Amend. No. 8, 2025 Cal. Stat., ch. 156 ...........................................4, 25, 32

Cal. Elec. Code § 10 ...........................................................................................................10

Cal. Elec. Code § 21454 .....................................................................................................31

Cal. Gov. Code § 12159......................................................................................................10

Cal. Gov. Code § 12172.5...................................................................................................10

Ind. Code § 3-3-2-1 .............................................................................................................3

Sen. Bill No. 280, 2025 Cal. Stat., ch. 97 ..........................................................................4

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. V, § 1........................................................................................................28

Cal. Const. art. XVIII, § 1...........................................................................................4, 30, 31

Cal. Const. art. XVIII, § 4...........................................................................................4, 31, 34

Cal. Const. art. XXI, § 1 .......................................................................................2, 30, 31, 32

Cal. Const. art. XXI, § 2 .........................................................................................6, 27, 31

Minn. Const. art. IV, § 3 .....................................................................................................2

U.S. Const. art. I, § 4, cl. 1................................................................................... *passim*

U.S. Const. art. III................................................................................................. *passim*

U.S. Const. art. IV, § 4.............................................................................................................1

Utah Const. art. IX, § 1 ...........................................................................................................2

**COURT RULES**

Fed. R. Civ. P. 12(b)(1).....................................................................................................7, 26

Fed. R. Civ. P. 12(b)(2)...........................................................................................................7

Fed. R. Civ. P. 12(b)(3)...........................................................................................................7

Fed. R. Civ. P. 12(b)(6)...........................................................................................................7

**OTHER AUTHORITIES**

Craig Patrick, *Florida eyes redistricting amid national political arms race*, Fox
    13 News Tampa Bay, Aug. 23, 2025 ....................................................................................3

H.B. 1, 103rd Gen. Assem., 2nd Ex. Sess. (Mo. 2025) ...................................................3

H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025)............................................................3

Josh Croup, *Ohio to redraw Congressional map for 2026 election*, Action News
    13, Dec. 18, 2024 ............................................................................................................3

The Ohio State General Assembly, It's Time for Congressional Redistricting . . .
    Again, Aug. 13, 2025.......................................................................................................3

**INTRODUCTION**

Plaintiff, a single U.S. congressman in Texas, asks this Court to grant him truly extraordinary relief: a declaratory judgment and preliminary and permanent injunctions enjoining California from placing Proposition 50 ("Prop 50") on the ballot for California's November 4, 2025 statewide special election ("Special Election"). That ballot measure proposes a state constitutional amendment providing California voters the choice as to how California conducts its redistricting procedures for federal congressional districts, consistent with the power granted to them under the U.S. Constitution's Elections Clause, U.S. Const. art. I, § 4, cl. 1. Plaintiff names as defendants Governor Gavin Newsom and Secretary of State Shirley N. Weber, claiming that they are illegally "enforcing" the proposed constitutional amendment, which has not yet been adopted by the voters, in alleged violation of California law. Plaintiff contends that if California proceeds with its Special Election, *and* if California voters approve Prop 50 and adopt the proposed amendment, *and* if voters in California and nationwide elect more Democrats to the U.S. House of Representatives, *and* if a host of other contingencies occur, he *might* lose some political power and perks, including congressional committee chairmanships and staff, media coverage, and presidential favor.

Notwithstanding the Supreme Court's unequivocal categorization of partisan gerrymandering claims as nonjusticiable political questions and the limited jurisdiction of federal courts, Plaintiff demands that this Court audit California's legislative redistricting choices pursuant to the California Constitution and other state law. To do so, he cloaks purely state law claims in the language of federal constitutional claims under the Elections and Guarantee Clauses of the U.S. Constitution. U.S. Const. art. I, § 4, cl. 1; art. IV, § 4. But state courts, not federal courts, are the appropriate first fora for examining claims premised solely on allegations of state law violations,

1

and California's Supreme Court has already summarily denied two petitions presenting many of the same purported state law violations brought by state legislators.[1]  In any case, a host of jurisdictional and other issues mandate that this case be dismissed:  (1) this Court lacks personal jurisdiction over both Defendants; (2) Texas federal court is not a proper venue; (3) the Court lacks subject matter jurisdiction; and (4) Plaintiff cannot succeed on the merits because neither the California Legislature's ("Legislature") placement of the constitutional amendment on the ballot nor its possible adoption by the voters could violate the California Constitution.

This Court has already determined that Plaintiff's brief and complaint fail to identify any facts supporting his allegations of irreparable harm, and that "'[e]ven assuming the reality of the harm which Plaintiff alleges, no injury could result until" November 2026, when "the first national election following November 4, 2025" will occur.  ECF No. 6 at 3.  Plaintiff concedes as much in his brief in support of his motion for preliminary injunction.  ECF No. 5 ("Mot.") at 25 ("There is ample time to adjudicate this matter before the next election cycle intensifies.")  With voting in the Special Election already commenced—and ballots from American voters living overseas already streaming in to county elections officials—this Court should deny Plaintiff's demand for preliminary injunctive relief and dismiss his claims in full.

**BACKGROUND**

I.     **TEXAS APPROVES MID-DECADE REDISTRICTING**

The U.S. "Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts."  *Growe v. Emison*, 507 U.S. 25, 34 (1993).  Exercising this authority, states often redraw their congressional district lines shortly after the national decennial census.  *See*, *e.g.*, Cal. Const. art. XXI, § 1; Minn. Const. art. IV, § 3; Utah

---

[1] *See Strickland v. Weber*, No. S292490, 2025 Cal. LEXIS 5421 (Cal. Aug. 20, 2025); *Sanchez v. Weber*, No. S292592, 2025 Cal. LEXIS 5694 (Cal. Aug. 27, 2025).

Const. art. IX, § 1; Ind. Code § 3-3-2-1.  Indeed, after the President encouraged Republican-led states, including Texas, to find more Republican seats through redistricting before the 2026 election, Texas convened a special legislative session and enacted House Bill 4 ("H.B. 4") to redraw its congressional district map mid-decade to elect more Republican candidates.  H.B. 4, 89th Leg., 2nd Special Sess. (Tex. 2025).  Explaining the purpose of the new law, Texas Governor Greg Abbott wrote on X:  "The new Congressional Map I signed, along with the other Special Session agenda items, have moved the Texas G.O.P. further to the right.  Texas is now more Red than ever."[2]  Plaintiff proclaimed the passage of H.B. 4 to be a "win[]" for Texas Republicans in a post thanking the President, Governor Abbott, and Republican state legislators for their work championing H.B. 4.[3]

## II.    CALIFORNIA AND OTHER STATES CONSIDER MID-DECADE REDISTRICTING

After Texas redrew its congressional district lines mid-decade to provide Republicans a partisan advantage, several other states considered doing likewise.  California is just one example.[4]  Days before Texas officially enacted H.B. 4 to redraw its congressional district map, the California

---

[2]  *See* Gov. Greg Abbott (@GregAbbott_TX), X (Aug. 31, 2025, 8:23 p.m.), https://tinyurl.com/4s6vapfp.

[3]  *See* Rep. Ronny Jackson (@RonnyJacksonTX), X (Aug. 23, 2025, 9:30 a.m.), https://tinyurl.com/24xy7t75.

[4]  Following Texas's lead, Missouri was the second state to pass a bill to conduct mid-decade redistricting.  *See* H.B. 1, 103rd Gen. Assem., 2nd Ex. Sess. (Mo. 2025) (signed by Governor Mike Kehoe on September 28, 2025); *see also* https://tinyurl.com/mr2v7tah.  Florida's Legislature recently created a Select Committee on Congressional Redistricting.  *See* Craig Patrick, *Florida eyes redistricting amid national political arms race*, Fox 13 News Tampa Bay, Aug. 23, 2025, https://tinyurl.com/dtmwrjp4; Select Committee on Congressional Redistricting, Florida House of Representatives, https://tinyurl.com/4p62vsra (last visited Sept. 24, 2025).  Utah must draw new district lines, too, after its high court affirmed a decision finding its earlier map violated Utah law. *See League of Women Voters of Utah v. Utah State Legislature*, __ P. 3d __, 2025 WL 2662164,*1 (Utah 2025).  And Ohio must also redistrict by the end of 2025.  *See* Josh Croup, *Ohio to redraw Congressional map for 2026 election*, Action News 13, Dec. 18, 2024, https://tinyurl.com/3na6y84w; The Ohio State General Assembly, It's Time for Congressional Redistricting . . . Again, Aug. 13, 2025, https://tinyurl.com/mvs3f93j.

Legislature proposed a constitutional amendment to allow California to do the same.  Known as the Election Rigging Response Act, Assem. Const. Amend. No. 8, 2025 Cal. Stat., ch. 156 ("ACA 8" or "the ERRA"), the proposed amendment would allow the use of a new congressional district map for the 2026, 2028, and 2030 congressional elections and would override any and all other state constitutional provisions that would otherwise prevent use of this new map.  *See* ACA 8 § 4(b) (new map will be used "notwithstanding any other provision of this Constitution or existing law").[5]  A key feature of ACA 8 is that—*if* and *only if* adopted by the voters during the November 4, 2025 Special Election—it will amend Article XXI of the California Constitution to temporarily replace the independent Citizens Redistricting Commission's regular decennial redistricting with new maps described in Assembly Bill 604 ("AB 604"), 2025 Cal. Stat., ch. 96.  *See* ACA 8 § 4(b); Cal. Const. art. XVIII, §§ 1, 4 (requiring voter approval of legislatively referred constitutional amendments).[6]  The Commission would resume control over redistricting in 2031 after the next national census.  ACA 8 § 4(d).

The California Legislature described ACA 8 as an attempt "to neutralize the partisan gerrymandering being threatened by Republican-led states" nationwide, citing, as examples, ongoing redistricting efforts in Texas and potential redistricting in Florida, Ohio, Indiana, Missouri, New Hampshire, Nebraska, and South Carolina.  ACA 8.  Far from targeting any one

---

[5] Plaintiff's complaint and brief appear to reference an earlier version of proposed ACA 8 rather than the adopted legislation.  The full text of the final, chaptered ACA 8, as referred to California voters, may be accessed on California's Legislative Information website.  *See* https://leginfo. legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202520260ACA8 (last visited Sept. 30, 2025).

[6]  The Legislature approved ACA 8's referral to the voters and placement of Prop 50 on the ballot as part of a legislative package that included two related bills:  AB 604 (describing the congressional districts that will be used if voters approve Prop 50 in the Special Election); and Senate Bill No. 280 ("SB 280"), 2025 Cal. Stat., ch. 97 (setting the Special Election and outlining processes and timelines related to the Special Election and the June 2, 2026 statewide primary election).

state in particular, the California Legislature approved ACA 8 seeking to ensure that congressional maps nationwide are fair overall and ensure that the "2026 United States midterm elections for Congress" are "conducted on a level playing field[.]"  ACA 8.

Voting on Prop 50 is already underway.  On or around September 5, 2025, California counties transmitted ballots and balloting materials to absent military and overseas voters who requested them.  *See* Declaration of Jana M. Lean ("Lean Decl.") ¶¶ 9g, 9h, 9j, 15.[7]  Because California voters can begin voting as soon as they receive their ballots, voting in the Special Election has already started, and indeed some ballots from overseas voters have already been returned.  *Id.* ¶¶ 9h, 12-14.  Other voters will soon receive a vote-by-mail ballot.  *Id.* ¶ 10.  Starting September 22, 2025, the Secretary of State's Office began mailing Voter Information Guides to voters, and county elections officials began mailing county voter information guides and polling place notices to voters.  Lean Decl. ¶¶ 9k, 9l.  Starting October 6, 2025, county elections officials will begin mailing each registered voter a vote-by-mail ballot and packet.  *Id.* ¶ 10, Ex. A at 4 ¶ 29.  And by October 7, 2025, counties will have opened ballot drop-off locations.  *Id.*, Ex. A at 6 ¶ 34.  Before this Court rules on Plaintiff's motion, then, it is likely that all California voters who were registered to vote by October 6, 2025, will have already had an opportunity to cast their votes on Prop 50.

### III.    CHALLENGES TO CALIFORNIA'S REDISTRICTING EFFORTS

#### A. The California Supreme Court Already Denied Two Challenges by State Legislators

Before Plaintiff filed this lawsuit, a handful of Republican California state legislators filed two petitions seeking extraordinary relief directly from the California Supreme Court to prevent the Special Election from proceeding.  Like Plaintiff's complaint, the petitions alleged that in

---

[7]  The Declaration of Jana M. Lean is included in Defendants' concurrently filed Appendix.

passing certain bills implementing ACA 8's placement of Prop 50 on the ballot, the Legislature improperly enacted a new congressional district map and failed to comply with certain rules for passing legislation prescribed by the California Constitution. *See* ECF No. 1 ¶¶ 25-26. The California Supreme Court denied both petitions. *See Strickland v. Weber*, No. S292490, 2025 Cal. LEXIS 5421 (Cal. Aug. 20, 2025);[8] *Sanchez v. Weber*, No. S292592, 2025 Cal. LEXIS 5694 (Cal. Aug. 27, 2025).[9] No member of California's Legislature has filed another challenge in state or federal court to date. One California gubernatorial candidate has filed a federal challenge. *See Hilton v. Weber*, No. 8:25-cv-01988 (C.D. Cal., filed Sept. 4, 2025).

**B. Plaintiff Challenges California's Proposed Constitutional Amendment in Texas**

Plaintiff alleges that in placing Prop 50 on the ballot, the California Legislature "enacted a congressional redistricting in a manner forbidden by [Article XXI, § 2 of] California's Constitution," ECF No. 1 ¶ 26, thereby violating the Elections and Guarantee Clauses of the U.S. Constitution. *Id*. ¶¶ 23-33. He names California's Governor and Secretary of State as defendants. *Id.* ¶¶ 5-6.

Five days after filing suit, Plaintiff moved *ex parte* for a temporary restraining order or preliminary injunction, asking the Court to enjoin Defendants from enforcing and implementing ACA 8 during the pendency of this action. ECF Nos. 4-5. The Court denied Plaintiff's motion for a temporary restraining order, explaining that "Plaintiff does not advance any specific facts regarding what immediate and irreparable injury he allegedly will suffer if the TRO does not issue." ECF No. 6 at 3. The Court deferred ruling on Plaintiff's alternative request for a preliminary injunction. *Id*. at 4.

---

[8] Docket available at: https://tinyurl.com/54hbujxr (last visited Sept. 30, 2025).
[9] Docket available at: https://tinyurl.com/4cxp7zjm (last visited Sept. 30, 2025).

**LEGAL STANDARDS**

***Federal Rules 12(b)(1) and 12(b)(6).*** The Court applies similar standards in evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). *Williams v. Wynne*, 533 F.3d 360, 365 n.2 (5th Cir. 2008). A "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," but a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For Rule 12(b)(1) purposes, Plaintiff bears the burden of demonstrating that this Court has subject matter jurisdiction, which may be assessed on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *United States ex rel Johnson v. Raytheon Co.*, 93 F.4th 776, 783 (5th Cir. 2024). For Rule 12(b)(6) purposes, the Court may also consider "documents attached to the complaint" and "matters of which judicial notice may be taken." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

***Federal Rule 12(b)(2).*** "On a motion to dismiss for lack of personal jurisdiction, the plaintiff rather than the movant has the burden of proof." *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982). The Court may consider documents "referred to in the plaintiff's complaint and [] central to her claim," *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (quotation omitted), as well as affidavits placed in the record, *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006).

***Federal Rule 12(b)(3).*** A defendant may move to dismiss or transfer a case for improper venue under Federal Rule of Civil Procedure 12(b)(3). If a case falls within one of the categories under 28 U.S.C. § 1391(b), "venue is proper; if it does not, venue is improper, and the case must

be dismissed or transferred under [28 U.S.C.] § 1406(a)." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 56 (2013).  Plaintiff bears the burden of sustaining venue once it has been challenged.  *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1047-48 (S.D. Tex. 2000) (citations omitted).

***Preliminary Injunction.***   "A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up).  Plaintiff must make a "a clear showing" that he is "entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The party seeking a preliminary injunction bears the burden to show "a substantial likelihood of success on the merits," "a substantial threat of irreparable injury," "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and "that the grant of an injunction will not disserve the public interest."  *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted).  Only when the movant has "clearly carried the burden of persuasion" should such relief be granted. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).

## ARGUMENT

Plaintiff cannot succeed on the merits of his claims because the Legislature's passage of ACA 8 and placement of Prop 50 on the ballot did not violate the U.S. Constitution, California Constitution or any state or federal law.  But the Court need not even address the merits because myriad threshold jurisdictional issues mandate dismissal.  And in any event, Plaintiff's request for the extraordinary remedy of a preliminary injunction to prevent a state election regarding a proposed state constitutional amendment should be denied.

## I.   THE COURT MUST DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION

As a threshold matter, the Court must dismiss this case because Defendants are not subject to personal jurisdiction here.  "Due Process limits on the State's adjudicative authority principally

8

protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Walden v. Fiore*, 571 U.S. 277, 277, 284 (2014) (citation omitted). "[T]he proper focus is on the relationship among the defendant, the forum, and the litigation[.]" *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 486 (5th Cir. 2008). Personal jurisdiction may be exercised "where an alleged injury arises out of or relates to actions by the defendant *himself* that are purposefully directed to forum residents," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 463 (1985), and "the defendant's *suit-related* conduct [] create[s] a substantial connection with the forum State[,]" *Walden*, 571 U.S. at 284 (emphasis added). If the alleged conduct "happened to affect" Plaintiff in the forum state, that would "not . . . confer [personal] jurisdiction" because such effects would be "largely a consequence of [Plaintiff's] relationship with the forum, and not of any actions [Defendants] took to establish contacts with the forum." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 103-04 (5th Cir. 2018).

Plaintiff claims only that Defendants are subject to specific jurisdiction here; he does not assert that they are subject to general jurisdiction. ECF No. 1 ¶¶ 9-10; Mot. at 6. The Fifth Circuit applies a three-step inquiry to evaluate due process requirements for specific jurisdiction: (1) whether the defendant "purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there," (2) whether the case "arises out of or results from the defendant's forum-related contacts," and (3) whether "the exercises of personal jurisdiction are fair and reasonable." *Bulkley & Assocs., LLC v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of the State of Cal.*, 1 F.4th 346, 351 (5th Cir. 2021) (citation omitted). To maintain personal jurisdiction, all three questions must be answered "in the affirmative," *id.*, and as to each defendant, *Walden*, 571 U.S. at 286. This Court lacks personal jurisdiction because none of these elements is satisfied as to either defendant here.

9

**A.  Plaintiff Fails to Establish Minimum Contacts Between Defendants and Texas**

Because "[e]ach defendant's contacts with the forum State must be assessed individually[,]" *Calder v. Jones*, 465 U.S. 783, 790 (1984), a plaintiff "may not aggregate defendants' forum contacts[.]" *Rumble, Inc. v. World Fed'n of Advertisers*, No. 7:24-CV-0115-B, 2025 WL 2345076, at *4 (N.D. Tex. Aug. 13, 2025) (citation omitted).  Plaintiff fails to show minimum contacts for either defendant.

*Secretary Weber.*  Secretary Weber did not direct any activities toward or conduct activities in Texas, and Plaintiff fails to even allege otherwise.  Notably absent in this suit arising out of the passage of ACA 8—a constitutional amendment proposed by the California Legislature—are any factual allegations that the Secretary took part in the legislative process.  ECF No. 1 ¶¶ 2, 5, 9, 14-15; *cf.* Cal. Gov. Code §§ 12159, 12172.5 & Cal. Elec. Code § 10 (describing the Secretary's duties as California's record keeper and chief elections official); Lean Decl. ¶¶ 3-5.

Aside from an introductory paragraph identifying the Secretary as a party, ECF No. 1 ¶ 5, the complaint only attributes conduct to her in the aggregate.  *See id.* ¶ 9 (claiming "Secretary Weber and Governor Newsom are enforcing a plan"); *id.* ¶¶ 2, 4, 8-9 (making claims about "Defendants"); *id.* ¶¶ 14-15 (making claims about "Defendants" and their "allies").  Plaintiff "may not establish personal jurisdiction without specifying who did what," and because he makes no allegations regarding the Secretary's conduct in connection with this suit, he "fail[s] to meet [his] burden of establishing that each Defendant has minimum contacts with Texas." *Rumble, Inc.*, 2025 WL 2345076, at *4.

*Governor Newsom.*  Plaintiff's only allegation specific to Governor Newsom is the conclusory statement that he "championed and promoted" Prop 50 and "specifically targeted Texas with these efforts."  ECF No. 1 ¶ 6.  "[Specific] jurisdiction exists when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged

10

injuries that arise out of or relate to those activities." *WeInfuse LLC v. Endue Inc.*, No. 3:23-CV-02595-E, 2024 WL 3528646, at *4 (N.D. Tex. July 24, 2024) (cleaned up).  Governor Newsom did not conduct any suit-related activity in Texas, nor does Plaintiff claim he did.[10]

Plaintiff similarly does not allege any facts specific to the Governor demonstrating that he purposely availed himself of the privileges of conducting activities in Texas. *Bulkley*, 1 F.4th at 351.  Nor could he, because the plain language of the final, chaptered version of ACA 8, which placed Prop 50 on the ballot, states that it is a "response" to mid-decade redistricting efforts by "Republican-led states"—an effort to respond to *nationwide* conduct.  ACA 8.  ACA 8 mentions eight states by name, all in the context of the President's national call for mid-decade redistricting to benefit Republicans, and only one of which is Texas.  *Id.*  And while Texas was the first to answer the call, other referenced states are also undertaking or considering congressional redistricting.  *See supra* Background § II.  ACA 8 also includes a "call[] on all other states to commit to fair and impartial drawing of maps[,]" among other provisions that further highlight its national focus.  ACA 8.  While Plaintiff does not specify what conduct "championing and promoting" refers to, the idea that merely promoting state legislation could provide a basis for exercising personal jurisdiction over a state official is, on its own, untenable, because it would subject every official who voices public support for any legislation within their own state to any court's jurisdiction.  Given the national focus of ACA 8, the Court should conclude that "[a] collateral reference to the forum state is insufficient to establish personal jurisdiction[.]" *Busch v.*

---

[10]  Plaintiff's complaint references an article stating that Governor Newson "ran ads in Texas" in 2022.  ECF No. 1 ¶ 10.  But even if running an advertisement could establish minimum contacts, the conduct must be jurisdictionally relevant.  *Walden*, 571 U.S. at 289.  Advertisements about gun control and abortion law that predate current redistricting efforts by more than three years have no connection with this litigation.  *See Farmer Boys' Catfish Kitchens Int'l, Inc. v. Golden W. Wholesale Meats, Inc.*, 18 F. Supp. 2d 656, 660 (E.D. Tex. 1998) ("the litigation must result from alleged injuries that 'arise out of or relate to'" the conduct at issue).

11

*Viacom Int'l, Inc.*, 477 F. Supp. 2d 764, 772 (N.D. Tex. 2007) (citation omitted); *see Bulkley*, 1 F.4th at 354 ("minimum contacts must be 'known' and not 'hypothetical'").

Plaintiff must also show that "the *suit* [arises] out of or relate[s] to the defendant's contacts with the *forum*." *Rumble, Inc.*, 2025 WL 2345076, at *3 (cleaned up). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" Like in *Rumble*, "[n]one of the allegations that gave rise to this lawsuit occurred in Texas." *Id*. at *5. Vague claims about "Defendants and their allies," "California's scheme [to] alter[] Congress's power dynamics" and "harm" to "the citizens of Texas" do not suggest otherwise, because the acts of a defendant's "alleged co-conspirators in furthering the alleged . . . conspiracy cannot be used to establish personal jurisdiction over [the defendant]." *Id*. at *11; *see* ECF No. 1 ¶¶ 14-15, 22. There are "no jurisdictionally relevant contacts with" the forum state where the defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" the forum state in connection with ACA 8. *Walden*, 571 U.S. at 289. Given Defendants' lack of minimum contacts with Texas relating to ACA 8, personal jurisdiction would be neither "fair" nor "reasonable" here. *Bulkley*, 1 F.4th at 351.

### B.  "Effects Jurisdiction" Does Not Apply

Having failed to show sufficient contacts between Defendants and the forum, Plaintiff attempts to liken this case to *Calder v. Jones*, an intentional-tort case applying the concept of "effects jurisdiction." But *Calder* provides him with no basis to establish personal jurisdiction over the Defendants in this action.

In *Calder*, the court held that California properly exercised jurisdiction over two Florida journalists because "their intentional conduct in Florida [was] allegedly calculated to cause injury to [plaintiff] in California." *Calder*, 465 U.S. at 783. Dispositive to the analysis was that "plaintiff

[was] the focus of the activities of defendants out of which the suit arises[,]" the "allegedly libelous story concerned the California activities of a California resident[,]" "defendants' allegedly libelous article "impugned the professionalism of an entertainer whose television career was centered in California[,]" the article was based on "California sources," and the article was published in a magazine that "has its largest circulation" in California.  *Id*. at 788-90.  And although the defendants claimed a lack of contacts with California, the court concluded that "the 'effects' caused by the defendants' article —*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there."  *Walden*, 571 U.S. at 287-88 (discussing *Calder*); *see Calder*, 465 U.S. at 789.

Here, ACA 8 is a proposed state constitutional amendment addressing congressional redistricting of California seats, i.e., in California.  It does not reference Plaintiff at all, much less make him its "focus."  *Id*.  Instead, it speaks to the citizens of California and a nationwide audience. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 321 (5th Cir. 2021) ("[t]o target every [person] everywhere . . . is to target no place at all").  And Plaintiff makes no claim that either defendant's conduct focused on him.  In short, this case bears no similarity to *Calder*.  "The "key to *Calder* is that the effects of an alleged intentional tort are to be assessed as *part* of the analysis of the Defendant's relevant contacts with the forum."  *Id*. (citations omitted).  "Effects jurisdiction" is "rare," and while it applies outside of the defamation context[,] "it "is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state."  *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir. 1997); *see Stroman*, 513 F.3d at 486.

## II.   DISMISSAL IS WARRANTED BECAUSE TEXAS FEDERAL COURT IS NOT A PROPER VENUE

Because the Court lacks personal jurisdiction over Defendants, this case also is improperly venued under 28 U.S.C. section 1391 and warrants dismissal on this additional ground.  28 U.S.C.

13

§ 1406(a); *see Freedom Coal. of Drs. for Choice v. Centers for Disease Control & Prevention*, No. 2:23-cv-102-Z, 2023 WL 910543, at *2 (N.D. Tex. Nov. 3, 2023) (Kacsmaryk, J.).  Should the Court nonetheless find that venue is proper in this district, Defendants respectfully request the opportunity to brief a motion to transfer venue.  28 U.S.C. §§ 1404(a), 1406(a); *see Goldlawr, Inc. v. Heiman*, 367 U.S. 463, 466 (1962) (the Court's lack of personal jurisdiction over the defendants does not impact its ability to authorize a transfer of venue).

### III.    THIS COURT LACKS SUBJECT MATTER JURISDICTION

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "Before turning to the merits, [the Court] must 'determine as a threshold matter that [it] ha[s] jurisdiction'" over the parties and subject matter of this action.  *Moore v. Harper*, 600 U.S. 1, 14 (2023) (citation omitted).  Here, it is evident from the allegations in Plaintiff's complaint and the papers submitted in support of his motion for preliminary injunction that this Court lacks subject matter jurisdiction over this action.

#### A.  Plaintiff Pleads No Justiciable Cause of Action

##### 1.    Plaintiff's Guarantee Clause Claim, Like All Such Claims, Is Categorically Nonjusticiable

As even Plaintiff acknowledges, since 1849 "the federal courts have concluded that Guarantee Clause cases are political questions beyond their ken."  Mot. at 18 (collecting cases). The Supreme Court recently reaffirmed this conclusion in rejecting a challenge to a state's redistricting plan.  *See Rucho v. Common Cause*, 588 U.S. 684, 718 (2019).  This Court's inquiry necessarily ends there, and Plaintiff's Guarantee Clause claim must be dismissed.  *Baker v. Carr*,

369 U.S. 186, 227 (1962) ("any reliance on the Guarant[ee] Clause would be futile").[11]

### 2. Private Litigants Cannot Derive a Cause of Action Directly from the Elections Clause

Plaintiff also attempts to plead a claim directly under the Elections Clause of the U.S. Constitution, which provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations[.]"  U.S. Const. art. I, § 4, cl. 1. Plaintiff's sole theory is that California's Legislature failed to follow California state constitutional law in passing ACA 8, and thereby violated the Elections Clause because it "was not acting as a legitimate 'Legislature' under Article I, Section 4."  ECF No. 1 ¶ 26; *see also* Mot. at 1 (contending that ACA 8 "violates the Elections Clause [] by usurping power that the California Legislature does not lawfully possess under its own state constitution").

Yet, as an Eastern District of Texas court recently explained, "no cause of action based solely on the text of the Elections Clause exists for [individual] Plaintiffs to plead," as "Supreme Court precedent directly precludes" such a claim.  *Texas Voters Alliance v. Dallas Cnty.*, 495 F. Supp. 3d 441, 461-62 (E.D. Tex. 2020).  The court rested its conclusion on the Supreme Court's decision in *Lance v. Coffman*, 549 U.S. 437 (2007), a case in which a trio of Colorado voters claimed that a provision of Colorado's Constitution, as interpreted by the Colorado Supreme Court, violated the Elections Clause "by depriving the state legislature of its responsibility to draw congressional districts" under that clause.  *Id.* at 441.  The Supreme Court concluded that since the

---

[11] Plaintiff's citation to *Baker* does not support his claims.  Mot. at 19-20.  As Plaintiff's brief acknowledges, the claim in *Baker* "'neither rest[ed] upon nor implicate[d] the Guarant[ee] Clause.'"  *Id.* (quoting *Baker*, 369 U.S. at 209-10).  Rather, *Baker* involved a Fourteenth Amendment Equal Protection claim pleaded under 42 U.S.C. sections 1983 and 1988.  Plaintiff alleges no such civil rights claim here, and *Baker* provides no exception to the Supreme Court's blanket nonjusticiability rule.

"only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed," they failed to allege an actionable injury. *Id.* at 442 (noting that plaintiffs' alleged "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past"). The court in *Texas Voters Alliance* reasoned that although *Coffman* addressed lack of standing, "standing and subject matter jurisdiction are related (but distinct) concepts," and thus "the holding in *Coffman* signifies that private litigants cannot derive a cause of action directly from the constitutional text of the Elections Clause." 495 F. Supp. 3d at 461-62. The court explained that

> [t]he Elections Clause outlines a structural principle of the American system of federalism, dividing power concurrently between the states and Congress. U.S. Const. art. I, § 4, cl. 1. The Clause does not speak to individual rights. Any [individual] rights and corresponding remedies for Elections Clause violations must therefore arise from laws enacted by Congress pursuant to its authority under the Elections Clause [such as any remedies arising from the National Voting Rights Act or other civil rights statutes].

*Id.*[12]

Plaintiff here does not bring a claim on the premise that the California Legislature's passage of ACA 8 or placement of Prop 50 on the ballot violates an individual constitutional right or any federal statute Congress passed under its Elections Clause authority. His complaint and brief mention various constitutional principles in passing, but Plaintiff does not allege any other constitutional claims or identify any other purported violations of federal law. Rather, Plaintiff's Elections Clause claim is "in fact [a] state law claim[] disguised as [a] federal claim[]." *King v.*

---

[12] Other federal courts agree. As the Fourth Circuit recently explained, "'[t]he [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections' insofar as 'Congress declines to preempt state legislative choices.'" *Sharma v. Hirsch*, 121 F.4th 1033, 1038 (4th Cir. 2024) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)), *cert. denied*, 145 S. Ct. 1966 (2025). As such, "[w]hen states do not otherwise violate constitutional rights and requirements"—such as the First, Fourteenth, and Fifteenth Amendments—"only Congress may supersede their discretionary authority" to enact or adopt election rules and redistricting plans. *Id.*

*Whitmer*, 505 F. Supp. 3d 720, 737 (E.D. Mich. 2020) (rejecting as noncognizable the Elections Clause claim of Michigan elector candidates who—like Plaintiff—premised their claim solely on violations of state elections laws). This Court should decline Plaintiff's invitation "to find that any alleged deviation from state election law . . . opens the door to federal review." *Id.* Plaintiff fails to identify any precedent "supporting such an expansive approach." *Id.*

Plaintiff urges the Court to adopt a rule that would permit federal district courts to consider in the first instance an otherwise nonjusticiable claim of partisan gerrymandering under the auspices of ensuring a state legislature's compliance with the Elections Clause—premised on the mere *allegation* that a state did not follow *its own* laws. Mot. at 15-18 (citing a law review article for the contention that "the framers intended the Elections Clause to be a limitation on the ability of state legislatures to manipulate the outcomes of congressional elections"). That theory would confer astonishingly broad power upon the federal courts. The Supreme Court confirmed in *Rucho* that "[i]n two areas—one-person, one-vote and racial gerrymandering—[the Court's] cases have held that there is a role for the [federal] courts with respect to at least some issues that could arise from a State's drawing of congressional districts." 588 U.S. at 699. But it also clarified that when it comes to partisan gerrymandering (which necessarily includes the question whether to engage in a partisan gerrymander or not under state law), the Framers "settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress," with no "suggestion that the federal courts had a role to play" under the Elections Clause. *Id.*

Moreover, adopting Plaintiff's proposed rule—permitting federal courts to become the primary arbiters of *state* constitutional law—would eviscerate the federalism principles undergirding the division of roles traditionally assigned between state and federal courts, wherein

17

federal courts are courts of limited jurisdiction, and state courts are assigned primary responsibility for determining what their own states' laws mean. *See Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental" to our Constitutional scheme "that state courts be left free and unfettered by [federal courts] in interpreting their state constitutions."). And it would directly conflict with the text of the Elections Clause itself.

*Moore v. Harper* does not lend support to Plaintiff's insistence on on-demand federal district court review any time a plaintiff alleges that a state legislature stumbled beyond the bounds of the power delegated to it by the Elections Clause by running afoul of its own state law. Indeed, *Moore* expressly affirmed the principle that "*[s]tate courts* are the appropriate tribunals . . . for the decision of questions arising under their local law, whether statutory or otherwise." 600 U.S. at 34 (emphasis added); *see also Sharma*, 121 F.4th at 1039 ("[T]he proper venue for debates over discretionary state election policies remains with Congress, more so than with the federal courts."). And while *Moore* did state that federal courts "have an obligation to ensure that state court interpretations of that law do not evade federal law," 600 U.S. at 34, that obligation is generally limited to reviewing state courts' decisions construing their own laws to ensure that the court's interpretation is not so beyond the pale as to "transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in *state legislatures* to regulate federal elections," *id.* at 36 (emphasis added). Plaintiff's position here is that a federal district court may, in the first instance, set aside actions of the state legislature, even when the highest state court has rejected claims that the state legislature's actions violate state law—a complete inversion of *Moore*, which reserved to the United States Supreme Court a power to review state court action for alleged abuses that undermine state legislative power over federal elections.

**B. Plaintiff Cannot Establish the Requisite Article III Standing or Ripeness**

Even if Plaintiff had identified a justiciable cause of action not beyond the bounds of the

18

Court's jurisdiction, the complaint would still require dismissal because Plaintiff fails to carry his burden to establish standing and ripeness—two related justiciability doctrines originating in Article III's case-or-controversy requirement. *Trump v. New York*, 592 U.S. 125, 131 (2020). The standing doctrine requires a plaintiff to "demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380. A case must also be "'ripe'—not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump*, 592 U.S. at 131. Neither doctrine's requirements has been met here.

### 1. Plaintiff Cannot Establish Any Cognizable Injury-in-Fact

Plaintiff cannot satisfy the injury-in-fact requirement to establish standing. To do so, a plaintiff "must plead that 'he has sustained or is immediately in danger of sustaining some direct injury.'" *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). This injury must "be 'concrete,' meaning that it must be real and not abstract." *All. for Hippocratic Med.*, 602 U.S. at 381. It also must be "particularized," that is, it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Id.* And where, as here, a plaintiff seeks prospective relief, the plaintiff "must establish a sufficient likelihood of future injury." *Id.* Plaintiff cannot show that he has suffered, or imminently will suffer, any injury in fact.

*First*, Plaintiff has alleged only speculative and conjectural harm. He contends that *if* California voters approve Prop 50 in the November 2025 election, and *if* Texas voters vote to advance Plaintiff in the primary election and then elect him to a new term in the November 2026 election, and *if* voters nationwide elect more Democrats than Republicans in the November 2026 election, and *if* voters nationwide would have elected more Republicans than Democrats had

19

California voters not approved Prop 50, *then* he will suffer injury.  This case is "riddled with contingencies and speculation that impede judicial review."  *Trump*, 592 U.S. at 131.  "The possibility, that maybe, in the future, if a series of events occur, [Plaintiff], and [Republicans] nationwide, might suffer some injury is clearly too impalpable to satisfy the requirements of Art. III."  *Trinity Indus., Inc. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992); *see also Bruni v. Hughs*, 468 F. Supp. 3d 817, 824 (S.D. Tex. 2020) ("Given the numerous suppositions that must occur before Plaintiffs might suffer any harm," including suppositions about future voter conduct, "the Court finds that Plaintiffs' injuries are not certainly impending and fail to satisfy Article III."); *Texas Voters Alliance*, 495 F. Supp. 3d at 469 ("Given the near-infinite variables affecting a federal election," plaintiffs' concern about a changed electoral outcome was "'wholly speculative'"). [13]

*Second*, Plaintiff does not have standing to sue California officials "simply because [he] believes that [they are] acting illegally" under California law, for "[a] citizen may not sue based only on an 'asserted right to have the Government act in accordance with law.'"  *All. for Hippocratic Med.*, 602 U.S. at 381.  Plaintiff's casting of his state law arguments as federal constitutional violations does not change this analysis; where the alleged injury is simply that Defendants "violated the Elections Clause," without any attendant federal statutory or constitutional violation, federal courts have "held that the plaintiffs lacked Article III standing because they claimed harm only to their interest, and that of every citizen, in proper application of the Elections Clause."  *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 349 (3d Cir. 2020) (*Bognet*), (citing *Coffman*, 549 U.S. at 442), *cert. granted, judgment vacated as moot sub nom.*

---

[13]  Properly evaluating Plaintiff's claimed injury also requires speculation about redistricting in other states.  Texas's decision to conduct mid-decade redistricting has led other states to consider doing the same. *See supra*, Background § II.  How many states will ultimately attempt to redistrict, and to what effect, is yet another unknown variable in the causation calculus.

*Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). "[C]ourts routinely dismiss such cases[.]" *Id.* (citation omitted); *see also supra* Argument § III(A)(2).

*Third*, Plaintiff cannot "establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). He worries that if Republicans lose their House majority following the November 2026 election, then he will lose the perks of being aligned with the party in power, and that Prop 50 (if California voters approve it) will be in part responsible for this loss. Mot. at 4. But this concern about an abstract loss of group political power that would affect all Republican members of the House is not a cognizable *personal* interest that could support a claim brought under the Elections Clause. Rather, as one district court put it, "because the Elections Clause grants rights to 'the Legislature' of 'each State,'" the "Plaintiff['s] Elections Clause claims thus belong, if to anyone, [to the] state legislature." *King*, 505 F. Supp. 3d. at 736 (internal citations omitted); *accord Bognet*, 980 F.3d at 349-50 (similar).[14] Indeed, in rejecting the State of Texas's motion for leave to file an original bill of complaint alleging that several states violated the closely related Electors and Elections Clauses of the U.S. Constitution by implementing alternative emergency procedures for voting in the 2020 general election during the COVID-19 pandemic,[15] the U.S. Supreme Court stated unequivocally that "Texas has not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections." *Texas v. Pennsylvania*, 141 S. Ct. 1230

---

[14] *Compare Raines*, 521 U.S. at 819, 821, 829 (six individual members of Congress lacked standing to challenge the Line Item Veto Act because they could claim no personal stake in the litigation and had "not been authorized to represent their respective Houses of Congress"), *with Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015) (*AIRC*) (finding standing where the "Arizona Legislature, in contrast [to the *Raines* legislators], is an institutional plaintiff asserting an institutional injury, and it commenced this action after authorizing votes in both of its chambers").

[15] State of Texas's Mtn. for Leave to File Bill of Complaint, *Texas v. Pennsylvania*, No. 22-155 (S. Ct. Dec. 7, 2020).

21

(2020).  If the entire State of Texas could not demonstrate a cognizable interest in ensuring that other states enact only lawful elections rules for their voters, there can be little doubt that a lone Texas congressman cannot demonstrate any cognizable interest in how California develops rules governing "[t]he Times, Places and Manner of holding Elections for . . . [its] Representatives[.]"  U.S. Const. art. I, § 4, cl. 1.

Plaintiff argues that he is comparable to the congressman in *Powell v. McCormack*, 395 U.S. 486 (1969), who was found to have standing to challenge a House resolution that barred him specifically from taking his seat and receiving his salary.  *Raines*, 521 U.S. at 820-21; Mot. at 12.  But ACA 8's proposed redrawing of California congressional districts is not directed at Plaintiff *specifically*.  And "[u]nlike the injury claimed by Congressman Adam Clayton Powell, the injury claimed by [Plaintiff] here is not claimed in any private capacity but solely because [he is a] Member[] of Congress"—and in particular, a Member of Congress who is aligned with the party in power.  *Raines*, 521 U.S. at 819.  He claims, for instance, that if Republicans lose control over the House in the future, he will lose the benefits of being a Member of the party in power, including the right to extra staff, legislative influence, Presidential favor, and media visibility.  Mot. at 4, 12; ECF No. 4-1 ¶ 9.  But again, all Republican Members of the House could endure these losses if voters choose to elect more Democrats and Republicans lose control over the House.  He further claims he could lose his chairmanships on two subcommittees if Republicans lose their House majority.  Mot. at 4, 12 & ECF No. 4-1 at ¶ 9.  In that scenario, too, all Republican Members of the House, not just Plaintiff, would lose their chairs on House committees and subcommittees.  These feared harms—which involve no direct harm to Plaintiff specifically and are risks inherent in every congressional election—do not give Plaintiff a personal right to challenge any law anywhere that might *potentially* impact the composition of the House in the future.  *See Texas*

22

*Voters Alliance*, 495 F. Supp. 3d at 452 ("an interest 'in influencing the legislature's overall composition and policymaking' is not the 'individual and personal injury of the kind required for Article III standing'" [quoting *Gill v. Whitford*, 585 U.S. 48, 68] (2018)).[16]  Moreover, Plaintiff's argument requires that the Court assume he will win reelection in 2026.

At bottom, Plaintiff is concerned about the effect that redistricting "has on the fortunes of political parties," along with any indirect impacts to his political prospects.  *Gill*, 585 U.S. at 72. These concerns do not give rise to a cognizable legal interest sufficient to support individual standing.  *Id.*  Indeed, the Supreme Court has confirmed that "[f]ederal judges have no license to reallocate political power between the two major political parties[.]"  *Rucho*, 588 U.S. at 718.

### 2. Plaintiff Cannot Establish That Any Alleged Injury Would Be Fairly Traceable to ACA 8, Prop 50, or Defendants' Actions

To establish causation, Plaintiff must show that his injury is "'fairly . . . trace[able] to the challenged action of the defendant[s], and not ... th[e] result [of] the independent action of some third party not before the court.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (citation omitted).  Causation is "'ordinarily substantially more difficult to establish'" when a plaintiff, as here, challenges a law regulating other actors and alleges a harm hinging on the responses of these other actors.  *All. for Hippocratic Med.*, 602 U.S. at 382.  To establish causation in such circumstances, a plaintiff "generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts."  *Id.* (internal quotation marks omitted).  Instead, "to thread the causation needle in those circumstances, the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiff[]."  *Id.* (internal

---

[16] Nor does Plaintiff's fear that a theoretical future Democratic House majority might subject him to "political probes" based on his "significant political support of President Trump," Mot. at 11, have any cognizable connection to actions of the California Legislature in passing ACA 8, or to any actions of the Governor and Secretary of State, the named Defendants here.  A congressman of any party might end up subject to such probes, regardless of how California draws its districts.

quotation marks omitted).

Plaintiff's claimed injury is too speculative to thread the causation needle here. "It is not sufficiently predictable how" California voters will respond to Prop 50 in the Special Election, nor is it sufficiently predictable how voters in Texas or nationwide will act in the November 2026 primaries or general election. *All. for Hippocratic Med.*, 602 U.S. at 383. His alleged injury is also too attenuated, flowing from his fear that California voters' potential approval of Prop 50 could have "distant . . . ripple effects" that might harm him over a year later. *Id*. Plaintiff claims that redistricting under ACA 8 (if voters approve Prop 50)—in combination with other state and national elections laws, voting patterns, and more—*might* cause Republicans across the nation to lose control of the House following the November 2026 election, which would in turn harm him because he could lose subcommittee chairmanships. Mot. at 3, 12; ECF No. 4-1 at ¶ 9. Far from showing causation, "Plaintiff['s] assertions are like throwing a breadcrumb trail on a windy, north Texas afternoon." *Texas Voters Alliance*, 495 F. Supp. 3d at 454.

### 3. Plaintiff Cannot Establish Redressability

Plaintiff cannot establish redressability for similar reasons. Plaintiff must show that his alleged injury is likely to be redressed by a favorable judicial decision. *Carney v. Adams*, 592 U.S. 53, 58 (2020). As with causation, redressability "is ordinarily 'substantially more difficult' to establish" when the alleged injury "'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Lujan*, 504 U.S. at 562 (citation omitted).

Plaintiff cannot show that a court order barring Defendants from preparing for or holding the November 2025 Special Election, or directing Defendants not to use AB 604's proposed maps in the 2026 primary or general elections, would likely redress his alleged injury. As this Court recognized in rejecting Plaintiff's request for a temporary restraining order, Plaintiff's claimed

24

injuries could only occur—if ever—after a nationwide election in November 2026 that will decide whether Republicans or Democrats control the House. *See* ECF No. 6 at 3. But as just discussed, Plaintiff can only speculate about the ultimate outcome of the November 2026 general election and ACA 8's potential role (if voters approve Prop 50) in that outcome. He even acknowledges ACA 8's limited potential impact, stating that California's proposed new maps could potentially alter "several" House seats out of 435—approximately one percent of total House seats, ECF No. 1 ¶ 22, which might "cause [him] to lose [his] subcommittee chairmanships, reduce [his] staff resources, and diminish [his] legislative influence," ECF No. 4-1 ¶ 9; *accord* Mot. at 12. Plaintiff's speculation about Prop 50's approval and ACA 8's impact is insufficient to establish redressability, for it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

That Plaintiff may not challenge California's redistricting efforts under the Elections Clause in federal court does not leave him without recourse to secure the fair redistricting he purports to seek. "[T]he Framers gave Congress the power to do something about partisan gerrymandering in the Elections Clause." *Rucho*, 588 U.S. at 720. ACA 8 itself declares a commitment to "fair representation for all communities," and—acknowledging Congress's supervisory role over the states' redistricting processes—"call[s] on the Congress of the United States to pass federal legislation and propose an amendment of the United States Constitution to require the use of fair, independent, and nonpartisan redistricting commissions nationwide." ACA 8, § 4(a). As a U.S. congressman, Plaintiff holds the power to introduce legislation or lobby his colleagues to adopt such a nationwide policy of nonpartisan redistricting or to "make or alter" other redistricting rules as permitted by the Elections Clause. U.S. Const. art. I, § 4, cl. 1.

### 4. Plaintiff's Claims Are Not Ripe

"Ripeness often overlaps with standing, 'most notably in the shared requirement that the

25

injury be imminent rather than conjectural or hypothetical.'" *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008). As discussed, and as this Court recognized in denying the TRO, Plaintiff's claims are dependent on a series of guesses about contingent future events that may never occur. If voters do not approve Prop 50 on November 4, 2025, this Court need not consider the thorny political issues presented by Plaintiff's claims at all. Because any prediction about whether California voters will approve Prop 50 "is 'no more than conjecture' at this time," the Court should dismiss this case as unripe if it does not dismiss on other grounds. *Trump*, 592 U.S. at 131.

### C. Plaintiff's Claims are Barred By the Eleventh Amendment

Eleventh Amendment sovereign immunity "is a jurisdictional bar in [the Fifth] [C]ircuit." *El Bey v. Dominguez*, 540 F. Supp. 3d 653, 678 (N.D. Tex. 2020) (Kacsmaryk, J.) (citations omitted); *cf. Catlett v. Duncanville Indep. Sch. Dist.*, No. 3:09-CV-1245-K, 2010 WL 2217889, at *2 (N.D. Tex. May 27, 2010) (noting that a motion under Rule 12(b)(1) is the proper vehicle for arguing that a suit is barred by sovereign immunity). It generally bars official-capacity suits against state officials, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), and generally applies to both federal and state claims brought in federal court, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). One exception, the *Ex parte Young* doctrine, allows private suits for prospective relief to prevent "an ongoing violation of federal law," but does not extend to suits for prospective relief for violations of *state* law. *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011); *see also Ex parte Young*, 209 U.S. 123, 159-60 (1908); *Pennhurst*, 465 U.S. at 106.

Sovereign immunity bars Plaintiff's official-capacity suit against Defendants unless one of three exceptions applies—waiver, abrogation, or the *Ex parte Young* doctrine. *Will*, 491 U.S. at 71; *City of Austin v. Paxton*, 943 F.3d 993, 997-98 (5th Cir. 2019) (citations omitted). None of

these exceptions applies here. *First*, California has not "unequivocally expressed" a waiver, and *second*, Congress has not "unequivocal[ly] express[ed]" an "intent to overturn" immunity. *Pennhurst*, 465 U.S. at 99; *see El Bey*, 540 F.Supp. at 675. *Third*, Plaintiff has at bottom alleged only a violation of state law, rendering the *Ex Parte Young* doctrine inapplicable. *Pennhurst*, 465 U.S. at 106. "[A] court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective'" to determine if the *Ex parte Young* exception applies. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). Here, Plaintiff purportedly seeks prospective relief by requesting an injunction "enjoining Defendants' implementation of the ERRA," a law that is not yet effective. ECF No. 1 ¶¶ 27, 32. He claims that "the ERRA and its adoption of AB 604 exceed California's own constitutional limits," "the California Legislature failed to adhere to the constitutionally required waiting period for new legislation," and "California enacted a congressional redistricting in a manner forbidden by . . . Article XXI, § 2 of the California Constitution[.]" *Id.* ¶¶ 25-26. In other words, Plaintiff's first cause of action seeks to remedy alleged violations of *state* law, despite being titled "Violation of the Elections Clause U.S. Const. Art. I, § 4[.]" *See Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450 (5th Cir. 2022) ("[l]etting a federal court tell state officials how to act under state law would conflict directly with the principles of federalism that underlie the Eleventh Amendment").[17]

Plaintiff's suit against Governor Newsom is barred for the additional reason that the

---

[17] Plaintiff's second cause of action similarly seeks prospective relief for a violation of *state* law—that "California ignores its Constitution"—under a heading citing the federal Guarantee Clause. ECF No. 1 ¶ 30. But this cause of action does not warrant a detailed discussion for two reasons: first, the same sovereign immunity analysis for the first cause of action applies here, and second, as explained above, "the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho*, 588 U.S. at 718.

Governor lacks the requisite enforcement authority with respect to ACA 8 and Prop 50. While he has a general duty to "see that the law is faithfully executed," Cal. Const. art. V, § 1, the connection that triggers *Ex parte Young* "is not merely the general duty to see that the laws of the state are implemented, but the *particular duty* to enforce the statute in question and a demonstrated willingness to exercise that duty," *Morris v. Livingston*, 739 F.3d. 740, 746 (5th Cir. 2014) (citations omitted and emphasis added).[18] Here, Governor Newsom has no such enforcement duty with respect to ACA 8 or Prop 50 and, consequently, he is not a proper defendant under *Ex parte Young* because directing him "not to enforce" either law "would not afford the Plaintiff[] the relief [he] seek[s]." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020); *see Morris*, 739 F.3d at 746.

## IV.   PLAINTIFF FAILS TO STATE A CLAIM ON THE MERITS

Even if Plaintiff could surmount all of the foregoing jurisdictional defects, his Elections Clause claim would fail because it rests entirely on a fundamental misunderstanding of that clause and California constitutional law. While it is generally true that "state legislatures remain bound by state constitutional restraints when exercising authority under the Elections Clause," *Moore*, 600 U.S. at 32, as well as by the U.S. Constitution and statutes passed pursuant to Congress's Elections Clause authority, nothing about ACA 8, Prop 50, or any action of the Defendants contravened those limitations. The Legislature's referral of a proposed constitutional amendment to California voters for approval or rejection did not violate federal *or* state law—nor would the

---

[18] Courts look to the language of the relevant statute or other state laws to determine if the official has the requisite enforcement authority. *See*, *e.g.*, *Morris*, 739 F.3d at 746 (identifying a statute making "clear" that a particular agency is "responsible for the section's administration and enforcement"); *Okpalobi v. Foster*, 244 F.3d 405, 416-17 (5th Cir. 2001) ("any probe into the existence of a *Young* exception should gauge . . . the ability of the official to enforce the statute at issue under his statutory or constitutional powers"); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 142 S. Ct. 522, 525 (2021) (evaluating the attorney general's enforcement authority).

28

Secretary of State's implementation or enforcement of the provisions of ACA 8 in the runup to the 2026, 2028, and 2030 congressional elections, should California voters approve Prop 50. The California Legislature's referral of a proposed constitutional amendment to the voters, as expressly authorized by the California Constitution, and implementation of new congressional maps pursuant to that proposed amendment, if adopted by the voters, does not and would not violate the California Constitution.

### A. Federal Law Does Not Bar States from Modifying Their Redistricting Processes

Nothing in the Elections Clause prohibits states from modifying their approaches to redistricting over time, so long as their selections comport with the U.S. Constitution, congressionally-imposed regulations, and their own laws governing statutory and constitutional amendments. A state's choice as to how to allocate power in redistricting "is a matter of state polity." *Smiley v. Holm*, 285 U.S. 355, 368 (1932). Thus, for example, the Supreme Court has held that the Elections Clause "neither requires nor excludes [] participation" of a state's governor in the redistricting process by way of the Legislature's allocation of veto power to the Governor. *Id.* And it has sanctioned a variety of other choices that states have made in structuring their redistricting processes as consistent with the Elections Clause and federal statutes, including a state constitutional amendment providing voters with the power to approve or reject by referendum legislature-conducted redistricting, *see State of Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 568 (1916), and the power to choose to redistrict by way of an independent redistricting commission, *see AIRC*, 576 U.S. at 813. Plaintiff identifies nothing in the Elections Clause or *any* federal statute barring a State from selecting a different redistricting approach by amending its own state constitution—once, twice, or a hundred times over. *See id.* at 824 (reasoning that "the Clause surely was not adopted to diminish a State's authority to determine its own lawmaking processes," and its provisions accord "with the fundamental premise that all political power flows

from the people" [citing *McCulloch v. Maryland,* 4 Wheat. 316, 404–405 (1819)]).

### B. The Legislature Did Not Violate the State Constitution in Passing ACA 8

Moreover, nothing in California law prohibits California voters from choosing to change the manner in which the State redistricts by way of a constitutional amendment. In interpreting the predecessor to today's Article XXI, which provided for decennial redistricting by the Legislature rather than the independent Citizens Redistricting Commission, the California Supreme Court unequivocally stated that "[t]he people of [California], as the ultimate source of legitimate political power, are of course free through *constitutional amendment* to adopt whatever changes in the existing system they consider appropriate, subject only to limitations contained in the Constitution of the United States." *Legislature v. Deukmejian*, 34 Cal. 3d 658, 680 (1983) (emphasis added). That is precisely what Prop 50 proposes here. Notably, Plaintiff fails to even mention *Deukmejian*, a case that definitively establishes that California may change its redistricting procedures by way of a state constitutional amendment. It is Plaintiff, then, who "ignore[s]" the California Supreme Court's construction of California's Constitution. ECF No. 1 ¶ 31.[19]

Since a legislatively referred constitutional amendment has no effect unless and until a majority of California voters approve it, ACA 8 will not be adopted, and no redistricting will occur, if the voters do not approve Prop 50.[20] Thus, setting aside Plaintiff's hyperbole, ECF No. 1 ¶¶ 25-

---

[19] The California Supreme Court in *Deukmejian* also held that mid-cycle congressional redistricting via "the people's reserved power of [statutory] initiative" was not permitted under the then-existing constitutional provisions of Article XXI, 34 Cal.3d at 663, 674-675, which are similar to those of current Article XXI in that they provide for decennial redistricting. However, Prop 50 proposes that voters adopt a constitutional amendment authorizing mid-cycle redistricting, which the California Supreme Court expressly held was permissible in *Deukmejian*. *Id.* at 680.

[20] The California Constitution expressly permits "[t]he Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, [to] propose an amendment or revision of the Constitution[.]" Cal. Const. art. XVIII, § 1. Any such legislatively proposed constitutional amendment "shall be submitted to the electors and, if approved by a majority of

30

26, 31; Mot. at 3, 5, 13-18, 20-23, the Legislature's proposal of a constitutional amendment pursuant to its expressly granted authority under Article XVIII, § 1 of the California Constitution—and subject to the voters' approval thereof under Article XVIII, § 4—necessarily could not have been an act of "secret[]" *ultra vires* redistricting "usurping" the power of the independent Citizens Redistricting Commission, ECF No. 1 ¶ 26; Mot. at 1. Providing for a statewide special election on whether to amend the California Constitution and officially adopt the maps proposed in AB 604 (an action which is expressly contingent on approval by the voters of ACA 8, *see* AB 604, 2025 Cal. Stat., ch. 96; Cal. Elec. Code § 21454), is squarely within the Legislature's authority under the California Constitution, so any claim premised on such allegedly *ultra vires* action necessarily fails.[21]

Moreover, the fact that the *current* version of the California Constitution prescribes decennial, nonpartisan redistricting by the independent Citizens Redistricting Commission, *see* Cal. Const. art. XXI, §§ 1, 2(e), does not render ACA 8 a "nullity," Mot. at 18, or constrain the California electorate's ability to adopt via constitutional amendment new maps mid-decade that take partisan or political considerations into account. The text of ACA 8, if adopted by voters, would expressly amend Article XXI of the California Constitution to provide for the temporary alternative redistricting procedure "notwithstanding any other provision of this Constitution or existing law"—including any and all provisions of California's current redistricting provisions

---

votes cast thereon, takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on" or on a designated date. *Id.*, § 4.

[21] Plaintiff's claim that Prop 50 somehow "open[s] the door to states intentionally establishing election schemes designed to evade the congressional checks over such schemes," Mot. at 14, is particularly misguided. Congress has not enacted any limitation on redistricting relevant here. And in any event, Congress (of which Plaintiff is a member) retains the power to "at any time by Law make or alter [] Regulations" governing the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1.

31

governing the independent Citizens Redistricting Commission and its process. ACA 8 § 4(b). Rather than "acting outside the law" and "attempting to exercise a power that its people had removed from it," "ignor[ing] its Constitution," or "flout[ing]" the "commands" of current Article XXI, ECF No. 1 ¶¶ 26, 31; Mot. at 16, the Legislature acted precisely *within* the confines of California state constitutional law, leaving to the voters the decision whether to temporarily take redistricting out of the independent Citizens Redistricting Commission's hands.[22]

Adopting Plaintiff's distorted, erroneous interpretation of California's Constitution would result in a one-way ratchet with breathtaking consequences: It would set a precedent that states could adopt independent redistricting commissions by way of constitutional amendment like California has, but never revert, via duly enacted constitutional amendment, to legislature-driven redistricting, while states whose constitutions currently assign sole power of redistricting to their legislatures would never be able to switch to independent commission redistricting. This absurd outcome would thwart the federalist balance struck by the Elections Clause's allocation of primary congressional redistricting power to the states, with supervisory power allocated to Congress. *See* U.S. Const. art. I, § 4, cl.1.[23]

## V.    PLAINTIFF FAILS TO SATISFY THE REMAINING PRELIMINARY INJUNCTION FACTORS

Even if Plaintiff could establish likelihood of success on the merits, he cannot satisfy his

---

[22] Nor could Plaintiff succeed in challenging on federal constitutional grounds California's consideration of political or partisan considerations if it passes ACA 8. The Supreme Court has acknowledged that "[t]o hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities." *Rucho*, 588 U.S. at 701.

[23] Although Plaintiff references a California constitutional provision requiring that bills be subject to public viewing for 30 days prior to legislative vote, he includes no factual allegations, fails to identify the provision, and does not appear to base his claims on any such procedural violation. *See* ECF No. 1 ¶ 25; Mot. at 3 (calling the *Strickland* lawsuit addressing that argument "ultimately unsuccessful and irrelevant to this dispute"). In any case, a "threadbare" legal conclusion of failure to adhere to a waiting period is insufficient. *Iqbal*, 556 U.S. at 678.

burden on the remaining preliminary injunction factors. The Court should deny interim relief.

### A. Plaintiff Cannot Establish Irreparable Harm

To meet the high bar of showing that "irreparable injury is *likely* in the absence of an injunction," *Winter*, 555 U.S. at 22 (emphasis in original), Plaintiff must show not only an injury that is "actual or imminent," rather than "speculative, conjectural, or hypothetical," as is required to demonstrate Article III standing, *Abdullah*, 65 F.4th at 208 (cleaned up); the injury must also be "substantial" and "immediate," *Lyons*, 461 U.S. at 111, such that absent interim relief, substantial harm will be felt before the case could be litigated on the merits in the normal course.

As this Court noted in rejecting Plaintiff's request for a temporary restraining order, "Plaintiff does not advance any specific facts regarding what immediate and irreparable injury he allegedly will suffer in the absence of" interim relief. ECF No. 6 at 3. Relying on the same brief and declaration, Plaintiff makes no effort to proffer any additional facts or law to bolster his request for a preliminary injunction. This lack of specific facts is fatal, as "an injunction is an 'extraordinary remedy' that should not issue absent a substantial threat that the movant will suffer irreparable injury without one." *Google, Inc. v. Hood*, 822 F.3d 212, 226 (5th Cir. 2016). Even when a litigant invokes important constitutional rights, that "invocation . . . cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Id.* at 228. And in any case, Plaintiff premises his claims not on any violation of his individual constitutional rights, but on the alleged failure of California's Legislature to follow California law.

A plaintiff cannot show irreparable harm simply by theorizing about possible harms, such as how voters may vote in future election contests; the harm must be *likely* absent interim relief. Nor can a plaintiff show irreparable harm based on remote events, such as an election more than a year away. "Given the near-infinite variables affecting a federal election," Plaintiff's concern about a changed electoral outcome is "'wholly speculative'" and cannot support injunctive relief

33

here. *Texas Voters Alliance*, 495 F. Supp. 3d at 469. And as this Court has already stated, Plaintiff's "argument itself reveals the lack of *imminent* irreparable injury," for "[e]ven assuming the reality of the harm which Plaintiff alleges, no injury could result until the first national election following November 4, 2025[.]" ECF No. 6 at 3-4 (emphasis in original). A preliminary injunction thus is not warranted. Indeed, Plaintiff himself acknowledges that "[t]here is ample time to adjudicate this matter before the next election cycle intensifies[.]" Mot. at 25.

### B. The Public Interest and Balance of the Equities Tip Sharply in Favor of Denying Interim Relief

In assessing the final preliminary injunction factors, "courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard for the public consequences." *Winter*, 555 U.S. at 24 (cleaned up). The balance of the equities and public interest factors "merge" when the government is the opposing party. *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017).

Issuing an injunction preventing the placement of Prop 50 on the ballot is tantamount to denying Californians a state constitutional right. *See* Cal. Const. art. XVIII, § 4 (giving voters the power to amend the state constitution by approving legislatively referred constitutional amendment); *cf. Alden v. Maine*, 527 U.S. 706, 752 (1999) ("A State is entitled to order the processes of its own governance."). And "[w]ith early voting already underway, the Court [should be] hesitant to interfere with the election process, especially noting the entanglement with [local measures on the ballot in some counties]." *Texas Voters Alliance*, 495 F. Supp. 3d at 455; Lean Decl. ¶¶ 9h, 13-14; *accord Mi Familia Vota*, 977 F.3d at 468 (refusing election-related injunctive relief because "it would be inappropriate for the district court to grant much of the requested relief with the election ongoing").

State and local officials have already spent considerable resources preparing the necessary

34

infrastructure for the Special Election, and voters have already started casting their votes.  Lean Decl. ¶¶ 9h, 13, 16-17.  "These investments of time, money, and the exercise of citizenship rights cannot be returned," and simply lifting the injunction would not restore the integrity of California's electoral system.  *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003); *see also Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015) (considering the "difficulty of restoring the *status quo ante*" when weighing the public interest); Lean Decl. ¶¶ 19-20.  With "[t]he state election machinery [] already well in motion," maintaining the status quo here—allowing the Special Election to continue with Prop 50 on the ballot—"will minimize confusion among both voters and trained election officials." *Texas Alliance for Retired Americans v. Hughs*, 976 F.3d 564, 569 (5th Cir. 2020).

Plaintiff does not claim that he is experiencing the loss of any individual constitutional rights beyond the alleged failure of the California Legislature to follow the California Constitution.  His bare interest in California following its own law cannot override Californians' interest in controlling how and when they may exercise their right to amend their state constitution.

**CONCLUSION**

Defendants respectfully request that the Court dismiss Plaintiff's complaint with prejudice and deny his motion for a preliminary injunction as moot.  In the event the Court declines to dismiss the complaint in full, it should deny the request for a preliminary injunction.

Dated: September 30, 2025

Respectfully submitted,

*/s/ Jennifer E. Rosenberg*
JENNIFER E. ROSENBERG
(CA SBN 275496; admitted *pro hac vice*)
*Deputy Attorney General*
   California Department of Justice
   Office of the Attorney General
   300 South Spring Street, Suite 1702

Los Angeles, CA 90013-1230
Telephone: (213) 269-6617
Fax: (916) 731-2124
E-mail:  Jennifer.Rosenberg@doj.ca.gov

ANYA M. BINSACCA
(CA SBN 189613; admitted *pro hac vice*)
*Supervising Deputy Attorney General*
E-mail:  Anya.Binsacca@doj.ca.gov
IRAM HASAN
(CA SBN 320802; admitted *pro hac vice*)
E-mail:  Iram.Hasan@doj.ca.gov
DAVID S. GREEN
(CA SBN 287176; admitted *pro hac vice*)
E-mail:  David.Green@doj.ca.gov
ARTIN T. DEROHANIAN
(TX SBN 24095346, CA SBN 266131; *Admitted in N.D. Texas*)
E-mail:  Artin.DerOhanian@doj.ca.gov
*Deputy Attorneys General*

*Attorneys for California Governor Gavin Newsom and California Secretary of State Dr. Shirley N. Weber*

36