IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| REPRESENTATIVE RONNY JACKSON, | |
| Plaintiff, | |
| v. | 2:25-CV-197-Z |
| SHIRLEY N. WEBER, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are two motions: Defendants Shirley Weber and Gavin Newsom's Motion to Dismiss Plaintiff's Complaint ("Defendants' Motion") (ECF No. 32), filed September 30, 2025, and Plaintiff Representative Ronny Jackson's Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiff's Motion") (ECF No. 4), filed September 4, 2025. Plaintiff responded to Defendants' Motion on October 5, 2025. ECF No. 35. Defendants filed an untimely Reply on October 20, 2025.[1] ECF No. 36. The Motions are now ripe. Having considered the briefing, Motions, and relevant law, Defendants' Motion is **GRANTED**. Plaintiff's Motion is **DENIED as MOOT**.

BACKGROUND

On August 21, 2025, Defendant Newsom signed a California state bill known as the Election Rigging Response Act ("ERRA"). ECF No. 33 at 14. Pursuant to the ERRA, the California electorate will soon vote on Proposition 50, a proposed amendment to the California Constitution. *Id.* If Proposition 50 passes, California will use "a new congressional district map for the 2026, 2028, and 2030 congressional elections." *Id.* Plaintiff claims the

---

[1] *See* N.D. TEX. R. 7.1(f) (requiring replies to be filed "within 14 days from the date the response is filed"). Defendants filed their Reply fifteen days after Plaintiff filed his Response. Accordingly, the Court does not consider Defendants' Reply in ruling on the Motions.

ERRA and Proposition 50 are designed to "engineer a Democratic majority in Congress"; Defendants argue that California only passed the ERRA after Texas and other "Republican-led states" approved similar redistricting measures. ECF Nos. 5 at 8; 33 at 13.

In early November, California voters will be asked to approve Proposition 50 through a statewide special election. *See* ECF No. 33 at 14–15 (noting that the election is slated for November 4, 2025, and that early voting is "already underway"). Remarkably, the vote on Proposition 50 comes just fifteen years after California voters overwhelmingly approved Proposition 20, giving the power to draw congressional districts "to an independent commission known as the California Citizens Redistricting Commission." *Proposition 50*, CALIFORNIA LEGISLATIVE ANALYST'S OFFICE, 2 (2025), https://lao.ca.gov/ballot/2025/prop50-110425.pdf [https://perma.cc/MMA8-38KF]. This nonpartisan commission currently consists of "14 members: 5 Democratic members, 5 Republican members, and 4 members who are not registered with either of those political parties." *Id.*

Plaintiff filed this suit on August 29, 2025, challenging the ERRA and Proposition 50 under California state law and two clauses of the U.S. Constitution: the Elections Clause[2] and the Guarantee Clause.[3] *See* ECF No. 1 at 1; ECF No. 5 at 22–23. Specifically, he contends the ERRA "is a plainly unconstitutional and retaliatory piece of legislation targeted against Texas, its citizens, and its congressional delegation." *Id.* at 2. Plaintiff named Weber and Newsom as defendants because, as Secretary of State and Governor of California, they are

---

[2] The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. CONST. art. I, § 4, cl. 1.

[3] The Guarantee Clause provides: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. CONST. art. IV, § 4.

"charged with enforcing the ERRA" and have "relentlessly championed and promoted" it. *Id.*

Defendants moved to dismiss the Complaint under four provisions of Federal Rule of Civil Procedure 12(b): Rule 12(b)(1), subject-matter jurisdiction; Rule 12(b)(2), personal jurisdiction; Rule 12(b)(3), improper venue; and Rule 12(b)(6), failure to state a claim. *See* ECF No. 33. For the reasons that follow, the Court addresses only Defendants' Rule 12(b)(1) subject-matter jurisdiction argument.

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows defendants to seek dismissal of an action for "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994)). The plaintiff "at all times bears the burden of demonstrating that subject matter jurisdiction exists." *Santerre v. Agip Petroleum Co.*, 45 F. Supp. 2d 558, 565 (S.D. Tex. 1999) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). This means plaintiffs must make "clear, distinct, and precise affirmative jurisdictional allegations" in pleadings, or else federal courts may not assert jurisdiction. *SXSW, L.L.C. v. Fed. Ins. Co.*, 83 F.4th 405, 407 (5th Cir. 2023) (quoting *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988)). This is because federal courts "presume that a cause lies outside their limited jurisdiction." *Kokkonen*, 511 U.S. at 377 (citation modified). Courts must consider jurisdictional challenges "before addressing any attack on the merits." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012); *see also Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

ANALYSIS

The Court "begins—and ends—with standing." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024) (citation modified). Because Plaintiff does not have standing, the Court lacks jurisdiction to reach the merits of this dispute.

I. STANDING

Article III of the Constitution limits the federal "judicial Power" to "Cases" and "Controversies." U.S. CONST. art. III, § 2. "This is a 'bedrock requirement.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Id.* (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines*, 521 U.S. at 818). The standing inquiry is about whether the plaintiff is the right person to bring the lawsuit. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992); *see also Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 12 (2023) (Thomas, J., concurring in the judgment) ("Standing asks, 'What's it to you?'" (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983) (citation modified))); William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 161 (2023) ("Doctrines like standing operate to ensure that the federal courts act as courts. Requiring proper parties ensures that [a case] is a judicially cognizable dispute, and requiring proper relief ensures that it is a judicially resolvable dispute.").

To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 285 (5th Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 (citation modified)). This is the "'[f]irst and foremost' of standing's three elements." *Spokeo*, 578 U.S. at 338–39 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "The second and third requirements, causation and redressability, are usually 'flip sides of the same coin.'" *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. ----, 145 S. Ct. 2121, 2133 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)); *see also Murthy*, 603 U.S. at 97 (Alito, J., dissenting) ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." (citation modified)). "Causation requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Far from being "an ingenious academic exercise in the conceivable," the standing inquiry requires the plaintiff to make "a factual showing of perceptible harm." *Lujan*, 504 U.S. at 566 (quoting *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688 (1973)).

*A. Injury-in-Fact*

As in *Spokeo*, this case "primarily concerns injury in fact." 578 U.S. at 338. Plaintiff argues he "suffers and will suffer concrete and particularized injury" because "enforcement of the ERRA would violate [his] rights and the structural constitutional principles that

5

protect all citizens." ECF No. 35 at 20. Among the purported rights Plaintiff points to are "his current legislative powers as chair of two subcommittees and personal access to a larger staff of advisors," his "influence over the congressional majority," and "opportunities to enhance his media visibility." ECF No. 5 at 18. He contends all of these "would be lost" if he "becomes a minority member of Congress." *Id.*

Plaintiff leans heavily on *Powell v. McCormack*, 395 U.S. 486 (1969). There, longtime Congressman Adam Clayton Powell won reelection to New York's 18th Congressional District. *Id.* at 489. Before he could be sworn in for the 90th Congress, the House of Representatives passed a resolution specifically barring Powell from taking his seat. *Id.* at 490. Powell then sued the Speaker of the House and several other defendants, seeking injunctive relief and a declaratory judgment that his exclusion was unconstitutional. *Id.* at 493–94. The Supreme Court held that Powell's suit "presented a case or controversy within the meaning of Article III" and that federal courts therefore had subject-matter jurisdiction over his claims. *Id.* at 496, 512–13 (citation modified). Plaintiff argues that "like Congressman Adam Clayton Powell," he will be "personally deprived of his current legislative powers as chair of two subcommittees and personal access to a larger staff of advisors" if California voters approve Proposition 50. ECF No. 5 at 18.

Plaintiff also attempts to distinguish *Raines v. Byrd*. *See* ECF No. 5 at 17. In *Raines*, four representatives and two senators who voted against the Line Item Veto Act filed suit in the District Court for the District of Columbia, arguing that the Act violated the Constitution's Presentment Clause. *Id.* at 814, 816. They alleged that the Act injured them "directly and concretely . . . in their official capacities" in three ways:

> The Act . . . (a) alter[s] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items, (b) divest[s] the [appellees] of their constitutional role in the repeal of legislation, and (c) alter[s] the constitutional balance of powers between the Legislative and Executive Branches, both with respect to measures containing separately vetoable items and with respect to other matters coming before Congress.

*Id.* at 816. The Supreme Court rejected the contention that any of these injuries could be direct and concrete, holding instead that the six "individual members of Congress" did not "have a sufficient personal stake in this dispute and ha[d] not alleged a sufficiently concrete injury to have established Article III standing." *Id.* at 830 (internal quotation marks removed).

The *Raines* Court's characterization of *Powell* is instructive. *Powell* was distinguishable, the Court wrote, for two reasons. First, because the *Raines* plaintiffs had not been targeted for "specially unfavorable treatment as opposed to other Members of their respective bodies." *Raines*, 521 U.S. at 821. Instead, their claim was only that "the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* Because they had not been "singled out," as Congressman Powell had been, their claimed injury was not sufficiently personal. *Id.* at 820–21. And second, the *Raines* plaintiffs did not argue that they had "been deprived of something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them*." *Id.* at 821 (emphasis in original). "Rather," the Court noted, the plaintiffs' "claim of standing [was] based on a loss of political power, not loss of any private right, which would make the injury more concrete." *Id.* To the extent they were injured at all, the injury was to each "Member's seat" in Congress, not to each plaintiff in his "private capacity." *Id.* In other words, even if the *Raines* plaintiffs *had* been "singled out for specially unfavorable treatment," their claimed injury—dilution of their political power and influence—was something they had no private right to in the first place.

7

Accordingly, they lacked standing to challenge the Act.

*Raines* makes clear that Plaintiff's suit is not judicially cognizable. His essential claim is that California's redistricting proposal could "cause[] a type of institutional injury"—namely, the potential "diminution" of his party's representation in Congress. *Raines*, 521 U.S. at 821. But if this occurs at all, such an outcome would "necessarily damage[] all" members of his party equally, not just Plaintiff. *Id.* Resisting this language in *Raines*, Plaintiff contends that like Congressman Powell, but "[u]nlike the appellees in *Raines*," he "*has* 'been singled out for specially unfavorable treatment as opposed to other Members of [Congress].'" ECF No. 5 at 17 (quoting *Raines*, 521 U.S. at 821 (emphasis added)). He writes that a "future Democrat-controlled House will likely subject" him to "political probes" and that this risk does not "affect all members of Congress equally." *Id.* But he fails to say why. He offers no evidence for the idea that a Democrat-controlled House is likely to subject any of their Republican colleagues to political probes—a far cry from *Powell*, where Congressman Powell had standing because the House had created a special "Select Committee to determine Powell's eligibility" and had specifically "excluded" him from taking his seat in the 90th Congress. *Powell*, 395 U.S. at 490, 510. And he doesn't seriously argue that he is more likely than his Republican colleagues to be the target of a such a probe, other than to note his "significant political support of President Trump." ECF No. 5 at 17. Plaintiff is hardly unique among Republican congressmen in that respect, however. Thus, his argument that he is uniquely likely to suffer retribution at the hands of a Democratic majority falls flat.

Plaintiff further insists that unlike the *Raines* plaintiffs, he does have "a personal stake in the outcome of this dispute" because he stands to lose individual "influence" and "opportunities to enhance his media visibility" if the House turns blue. ECF No. 5 at 18. Setting aside the fact that "influence" and "media visibility" are likely not judicially

8

cognizable, any influence and media visibility Plaintiff possesses are not his by private right; they are byproducts of the fact that he is the current U.S. Representative for Texas's 13th congressional district. Any influence and media visibility Plaintiff enjoys belong not to him, but to his office. Stated differently: If Plaintiff "were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead." *Raines*, 521 U.S. at 821. His claim thus runs with his seat, which he holds "as trustee for his constituents, not as a prerogative of personal power." *Id.* (citing THE FEDERALIST No. 62, at 378 (J. Madison) (C. Rossiter ed. 1961) ("It is a misfortune incident to republican government, though in a less degree than to other governments, that those who administer it may forget their obligations to their constituents and prove unfaithful to their important trust.")). It follows that Plaintiff's "claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete." *Raines*, 521 U.S. at 821; *see also Jackson Mun. Airport Auth. v. Harkins*, No. 21-60312, 2023 WL 5522213, at *10 (5th Cir. Aug. 25, 2023), *reh'g en banc granted, opinion vacated*, 78 F.4th 844 (5th Cir. 2023), *and on reh'g en banc, appeal dismissed as moot*, 98 F.4th 144 (5th Cir. 2024) (Duncan, J., concurring in part and dissenting in part) ("*Raines* teaches that individual lawmakers can't sue to vindicate a loss of political power but only a loss of a private right." (citation modified)). Accordingly, Plaintiff has failed to show that he will suffer a legally cognizable injury-in-fact.

### B. Causation

Even if Plaintiff's asserted injury—the "dilut[ion]" of "his influence as a Texas Congressman"—were judicially cognizable, it is too attenuated from California's passage of the ERRA to establish causation. ECF No. 5 at 15; *see also id.* at 10 ("Plaintiff and other Texas representatives would be relegated to the minority on their committees, which entails reduced staff and resources available to serve their constituents . . . ." (citation modified)).

Plaintiff writes that if this Court does not enjoin California's upcoming special election, California's new legislative districts "*will cause* the U.S. House of Representatives to shift from its Republican majority to a Democrat majority by the term beginning in 2027." ECF No. 5 at 10 (emphasis added). More accurately, California's approval of Proposition 50 *could* or *may* cause such a result. That's because Plaintiff's claims depend on all of the following occurring: California voters approving Proposition 50 in November 2025; California voters turning out for Democrats in overwhelming numbers in November 2026; that overwhelming turnout resulting in Californians electing more Democrats to the U.S. House than they already do;[4] and voters nationwide electing precisely the right number of Democrats, such that the entire U.S. House turns blue because of the seats California Democrats may flip in the 2026 midterms. If all of that happens, then Plaintiff *might* lose perks such as additional staff members, media visibility, and political influence. This is far too speculative to show causation. *See, e.g., Clapper*, 568 U.S. at 414 (no causation where the plaintiffs' claim rested on a "speculative chain of possibilities"); *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[S]peculation does not suffice."); *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990) ("Petitioner's alleged injury is too speculative to invoke the jurisdiction of an Art. III court."); *Allen v. Wright*, 468 U.S. 737, 759 (1984) (no standing where the "links in the chain of causation between the challenged Government conduct and the asserted injury" were "far too weak"); *Murthy*, 603 U.S. at 57 (finding no standing because of the "one-step-removed, anticipatory nature" of the plaintiffs' alleged injuries).

---

[4] Of California's fifty-two elected members of the U.S. House of Representatives, only nine are Republicans. *Directory of Representatives*, UNITED STATES HOUSE OF REPRESENTATIVES, https://www.house.gov/representatives [https://perma.cc/H2M4-ADSS].

*C. Redressability*

Causation and redressability "are usually 'flip sides of the same coin.'" *Diamond Alt. Energy*, 145 S. Ct. at 2133 (quoting *All. for Hippocratic Med.*, 602 U.S. at 379). That's true here: If causation is satisfied, so is redressability. But causation isn't satisfied. Plaintiff failed to show that California's approval of the ERRA will likely cause him to suffer a legally cognizable injury. It follows that enjoining California's upcoming special election would not redress any injury Plaintiff may suffer. *See* ECF No. 5 at 8 ("Plaintiff asks this Court to preliminarily enjoin Defendants from placing Proposition 50 on the ballot and otherwise implementing the ERRA."). Accordingly, Plaintiff lacks standing to challenge the ERRA and Proposition 50.

CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**. Plaintiff's Complaint and Motion for Temporary Restraining Order and Preliminary Injunction are **DISMISSED without prejudice**.

**SO ORDERED**.

October 23, 2025

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE